Filed 11/18/25  P. v. Harmon CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH ALAN HARMON et al.,<br><br>    Defendants and Appellants. | D085869<br><br><br>(Super. Ct. No. SWF2007471) |

APPEAL from judgments of the Superior Court of Riverside County, Francisco Navarro, Judge.  Reversed in part and remanded for resentencing.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant Kenneth Alan Harmon.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant Isaac Delarosa.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Kenneth Alan Harmon and Isaac Delarosa guilty of (1) first degree murder (Pen. Code,[1] § 187, subd. (a)), committed by lying in wait (§ 190.2, subd. (a)(15)) (count 1); and (2) attempted murder with premeditation and deliberation (§§ 187, subd. (a), 664, subd. (a)) (count 2). The jury made true findings as to Harmon that during both crimes he discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)) and that during the attempted murder he personally inflicted great bodily injury (§ 12022.7, subd. (a)). In addition, the jury found Harmon guilty of two counts of being a felon in possession of a firearm. (§ 29800, subd. (a)(1).) Harmon was sentenced to an indeterminate term of 57 years to life, plus life without parole and a determinate term of five years four months. Delarosa was sentenced to an indeterminate term of seven years to life, plus life without parole.

Harmon and Delarosa both contend that (1) in count 1, the evidence was insufficient to prove lying in wait, requiring reversal of both the lying-in-wait special circumstance findings and the first degree murder verdicts; (2) the trial court gave a prejudicially incomplete instruction on using lying in wait as a ground to find that the murder was of the first degree; and (3) the trial court prejudicially erred in declining to instruct the jury on the lesser included offense of voluntary manslaughter and attempted voluntary manslaughter based on imperfect self-defense. Delarosa further contends that the trial court prejudicially erred in allowing the prosecution to introduce evidence of a Facebook message in which he stated that he possessed a gun three weeks before the shooting at issue here.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

We conclude that insufficient evidence supports the finding of lying in wait in count 1. That conclusion requires us to reverse the finding on the lying-in-wait special circumstance, but it does not require a reversal of the first degree murder convictions, as they are supported by the alternative theory of premeditation and deliberation. We also conclude that none of the other issues raised by the parties provide a ground for reversal. According, we reverse the findings of lying in wait as a special circumstance in count 1, and we remand for resentencing.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 5:00 p.m. on February 9, 2020, Harmon and Delarosa walked together into the parking lot of a park in Romoland, where the victims A.V. and J.R. were sitting in A.V.'s parked car. The rear of A.V.'s car was backed into a parking space at the far end of the parking lot. A.V. was in the driver's seat, and J.R. was in the passenger seat with his window partially lowered. The passenger side of A.V.'s car was facing the entrance to the parking lot.

Harmon and Delarosa walked toward A.V.'s car along a sidewalk that eventually would have taken them past the back of the car. A law enforcement investigator interpreted a surveillance video to show that Harmon and Delarosa were wearing masks and hooded sweatshirts as they approached.

Upon reaching a position near the rear of A.V.'s car, Delarosa turned to walk along the car's passenger side, toward the front of the car. At the same time, Harmon charged toward the rear passenger side of the car and fired multiple gunshots toward the passenger-side window where J.R. was sitting. A.V. reacted to the gunshots by driving his car forward and pulling out of the

parking space. Harmon then ran toward A.V.'s moving car and fired at least two more shots toward the passenger-side window.

A.V. was shot in the right arm, but he managed to drive out of the parking lot. J.R. was shot in the head and later died as a result. A.V. drove approximately a mile and a half away and parked by an empty field, where, after a delay of several minutes, he called 911.

Law enforcement did not locate any weapons or bullet casings in or around A.V.'s car where it was parked near the field. Further, no evidence related to the shooting—such as bullets, casings or broken glass—were found in the parking lot where the incident occurred. After reviewing surveillance videos of the incident, law enforcement eventually identified Harmon and Delarosa as suspects.

An information alleged in count 1 that Harmon and Delarosa committed the first degree murder of J.R. (§ 187, subd. (a)), with lying in wait alleged as a special circumstance (§ 190.2, subd. (a)(15)). That count also alleged that Harmon discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)) and that Delarosa was armed with a firearm (§ 12022, subd. (a)(1)). In count 2, the information alleged that Harmon and Delarosa both committed the attempted murder of A.V. with premeditation and deliberation (§§ 187, subd. (a), 664, subd. (a)). It also alleged that Harmon discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) and that Delarosa was armed with a firearm (§ 12022, subd. (a)(1)). Based on Harmon's possession of a firearm during the February 9, 2020 shooting and when he was arrested on August 4, 2020, Harmon was charged with two counts of being a felon in possession of a firearm. (§ 29800, subd. (a)(1).)

4

At trial, the jury heard evidence that around the time of the shooting, Delarosa and A.V. were in a dispute with each other and had planned to fight at some point. Establishing the existence of that dispute, on January 30, 2020, Delarosa sent A.V. a message over Facebook to state he was upset that A.V. had shown up at his house at 4:00 a.m. and had woken up Delarosa's grandmother. In a series of Facebook messages, the two men agreed to settle the issue by fighting each other, and as of February 9, 2020, the fight had not yet taken place.

A.V. and Delarosa both testified at trial about the events of the afternoon leading up to the shooting. Many of those activities were also shown on surveillance video footage, as was some of the shooting itself.

According to A.V., he and J.R. arrived at the park on the afternoon of February 9, 2020 "just to hang out." Harmon and Delarosa were not at the park at the time. After spending some time at the park, A.V. and J.R. left to get food, beer and gas. They then returned, and A.V. backed into a parking space at the far end of the parking lot. From where they were parked, A.V. and J.R. had a clear view of anyone walking into the parking lot toward the car.

A minute or two later, Harmon and Delarosa were driven into the parking lot as passengers in their friend's vehicle. Instead of stopping in the parking lot, the friend's vehicle circled through it and then exited. Delarosa testified that he noticed A.V.'s car in the parking lot, and he asked his friend not to stop there because he did not want to have a confrontation with A.V. on that day.

Approximately 26 minutes after Harmon and Delarosa circled and left the parking lot in their friend's vehicle, Harmon and Delarosa entered the parking lot on foot and walked toward A.V.'s car. The car was still backed

5

into the parking space where it was located 26 minutes earlier, and A.V. and J.R. were still inside.

According to A.V., he and J.R. spent the intervening 26 minutes sitting in A.V.'s car where they listened to music and smoked. A.V. testified that he did not notice Harmon and Delarosa approaching on foot because he was looking at his phone, as was J.R. A.V. then heard shots coming from the right, and he immediately started his car and drove away. A.V. stated that neither he nor J.R. had a gun during the incident.

Delarosa testified that during the 26 minutes between the time that his friend's vehicle circled the parking lot and he and Harmon walked back into the parking lot, he and Harmon were in their friend's car at an elementary school that was adjacent to the park. According to Delarosa, they spent those 26 minutes smoking marijuana with their friend. Then, when the friend drove away, he and Harmon walked down toward the parking lot with the plan that they would walk through the parking lot and across the park to reach Harmon's house, which was on the other side of the park. Although Delarosa saw that A.V.'s car was still in the parking lot, he and Harmon nevertheless walked in the direction of A.V.'s vehicle because he "just felt like there wasn't a need to have any problems that day." Delarosa denied that he and Harmon were wearing masks, explaining that it was raining, so they were wearing caps and had their hooded sweatshirts pulled up, with the drawstring of Harmon's hood pulled tight.

According to Delarosa, as he and Harmon got near A.V.'s car, J.R. "popped up" from the reclined passenger seat and said "What's up fool?" through the open window. J.R. pulled out a gun and fired one shot toward

6

Harmon, who was on Delarosa's left, toward the back of the car.[2] Harmon took out a gun, which Delarosa did not know that Harmon had, and started shooting toward J.R. "in defense." Although J.R. shot his gun only once, at the very beginning of the incident, Harmon continued to fire at J.R. multiple times, even after A.V. started to drive away.[3]

The jury found Harmon and Delarosa guilty as charged, except that it rejected the allegation that Delarosa was armed with a firearm (§ 12022, subd. (a)(1)) in counts 1 and 2. Harmon was sentenced to an indeterminate term of 57 years to life, plus life without parole and a determinate term of five years four months. Delarosa was sentenced to an indeterminate term of seven years to life, plus life without parole.

## II.

## DISCUSSION

A.  *Challenge to the Sufficiency of the Evidence to Support Lying in Wait*

We first consider Harmon's and Delarosa's contention that insufficient evidence supports a finding that the killing of J.R. was committed by means of lying in wait.

Two different instructions gave the jury the opportunity to make a finding on lying in wait. First, the People charged both Harmon and

---

[2]  Consistent with Delarosa's testimony that J.R. fired a gun, a particle of gunshot residue was found on J.R.'s left hand, although an expert testified that the presence of the particle did not establish that J.R. discharged a firearm, as it could have been deposited by other means.

[3]  Four bullets struck the car. One of those bullets lodged in the rubber at the top of the front passenger window, and a second bullet lodged in the right rear roof. A third bullet passed through the glass on the lowered front passenger window, and a fourth bullet passed through the rubber at the base of the front passenger window. Based on the physical evidence, a defense expert agreed that there were at least four shots fired at the car, and possibly five.

7

Delarosa in count 1 with murder in the first degree based on two alternative theories: (1) the murder was committed with premeditation and deliberation; or (2) the murder was committed by lying in wait. (§ 189, subd. (a).) Second, the People alleged a special circumstance in connection with the murder, namely, that the murder was committed by means of lying in wait. (§ 190.2, subd. (a)(15).) The jury returned first degree murder verdicts in count 1, without an indication of which theory of first degree murder the jurors had selected, and the instructions did not require unanimity as to the theory. The jury also made a unanimous true finding on the lying-in-wait special circumstance.[4]

The lying-in-wait special circumstance requires " ' " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . ." ' " ' [Citation] The lying-in-wait special circumstance ( . . . § 190.2, subd. (a)(15)) includes the elements of first degree lying-in-wait murder ( . . . § 189, subd. (a)), but requires the additional element that the killing was intentional, not merely committed with implied malice." (*People v. Flinner* (2020) 10 Cal.5th 686, 748 (*Flinner*).) Therefore, if the evidence is sufficient to support the special circumstance, "it necessarily supports the theory of first degree lying-in-wait murder." (*Ibid.*) Because "the murderer who kills by lying in wait acts surreptitiously,

---

[4] Under current law, the only difference in the legal requirements between lying in wait for first degree murder and lying in wait for the special circumstance in section 190.2, subd. (a)(15) is that " 'the lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 549 (*Nelson*).)

concealing himself or his purpose and making a surprise attack on his victim from a position of advantage, thereby denying the victim any chance of escape, aid, or self-defense," "a murder committed by lying in wait historically has been viewed as ' "a particularly heinous and repugnant crime." ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 636–637 (*Johnson*).)

Harmon and Delarosa contend that insufficient evidence supports a finding in favor of the People on the elements of (1) a concealment of purpose; and (2) a substantial period of watching and waiting for an opportune time to act.

In assessing a challenge to the sufficiency of the evidence, we " ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation] The same standard applies when examining the sufficiency of the evidence supporting a special circumstance finding. [Citation] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

### 1. *Concealment of Purpose*

First, we examine whether sufficient evidence supports a finding of "a concealment of purpose." (*Flinner, supra*, 10 Cal.5th at p. 748.)

To support a finding of concealment of purpose, " ' " '[i]t is not required that [a defendant] be literally concealed from view before he attacks the victim.' " ' " (*People v. Barrett* (2025) 17 Cal.5th 897, 966–967.) "Rather, '[i]t is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct." ' [Citation.] The concealment, in that sense, " 'is that which puts the defendant in a position of advantage, from which the

9

factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise.' " ' " (*People v. Duong* (2020) 10 Cal.5th 36, 67 (*Duong*).) "[C]oncealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust, making it more blameworthy than premeditated murder that does not involve surprise." (*People v. Stevens* (2007) 41 Cal.4th 182, 204.)

Here, Harmon and Delarosa were certainly *visible* to A.V. and J.R. as they walked into the parking lot and toward A.V.'s car. However, two aspects of their approach are sufficient to support a finding that Harmon and Delarosa concealed their murderous *purpose* as they walked toward the car.

First, based on the surveillance videos and the testimony from law enforcement, the evidence was sufficient for the jury to find that Harmon and Delarosa were both wearing masks and had their hoods raised. From that fact, the jury could reasonably infer that Harmon and Delarosa were attempting to conceal their identities from A.V. so that they could get close to A.V.'s car without raising a concern in their victims that they intended to initiate the fight that A.V. expected to have with Delarosa. Because A.V. was expecting a fight with Delarosa, Harmon and Delarosa's attempt to conceal their *identities* by use of a mask is the functional equivalent of attempting to conceal their *hostile purpose* in approaching A.V.'s car. (See *People v. Hyde* (1985) 166 Cal.App.3d 463, 476 ["Concealment by disguise is, in our view, sufficient to support the giving of a 'lying in wait' instruction."].) Delarosa argues that because he had relationships with both victims, "[i]t is absurd to believe that Delarosa could sneak up on [A.V.] by wearing a face mask." The argument posits a factual question for a jury, not a sufficiency of the evidence question for our review on appeal. As we assess the evidence, a reasonable

10

juror could conclude that Harmon and Delarosa were at least *attempting* to conceal their identities, as they approached, by wearing masks and hoods.

Second, regardless of whether they were trying to conceal their identities, the surveillance video supports a finding that Harmon and Delarosa entered the parking lot and walked in the direction of A.V.'s car in a manner that concealed their true murderous purpose. Specifically, Harmon and Delarosa are shown walking with their heads down and at a normal pace on the sidewalk that eventually passes along the end of the parking space where A.V.'s car was backed in. Their path of travel would have taken them behind the *rear* of A.V.'s car, not toward the *front* of the car where A.V. and J.R. were sitting inside. That path of travel would give the impression that Harmon and Delarosa intended to pass behind A.V.'s car without incident. Conduct that gives the false impression of a non-threatening situation can satisfy the concealment of purpose requirement. (See *Duong, supra*, 10 Cal.5th at p. 67 ["[t]here was sufficient evidence of concealed purpose" when the defendant, who had been involved in a verbal altercation with the victim in a nightclub, sat back down at his table and waited for 10 to 15 minutes after getting back up, approaching the victim from behind, and shooting him]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1074 [concealment of purpose was shown when a defendant, who was detained by a police officer, moved closer to the officer and shot him while the officer was patting down another detainee, in that the defendant "managed to conceal his murderous purpose so well that he took the officer completely by surprise when he fired the single deadly shot at close range"].)

Further, Harmon's gun was not visible as he approached. Harmon's hiding of his weapon while he approached also supports a finding that he concealed his purpose, as it allowed him to walk within close range without

11

alerting his victims that he intended to shoot them.  (See *People v. Woodruff* (2018) 5 Cal.5th 697, 775 [evidence that the "defendant moved the gun behind his back," so that it could not be seen, supported a finding that the defendant's " 'true intent and purpose were concealed by his actions' "]; *People v. Cage* (2015) 62 Cal.4th 256, 279 [evidence that the defendant "hid his shotgun in a laundry basket" that contained clothes supported an inference that "defendant planned and undertook a deliberate subterfuge aimed at making his presence appear to be . . . innocuous" and that he "disguised his intent to kill"]; *People v. Tuthill* (1947) 31 Cal.2d 92, 101 [lying in wait was present when the defendant concealed his gun under his body while lying in bed and waiting for the victim].)

Accordingly, the evidence supports a finding that Harmon and Delarosa approached A.V.'s car in a manner that minimized the chance of drawing any attention to themselves or raising a suspicion that they intended to commit a shooting.  By the manner in which they approached, Harmon and Delarosa's " ' " 'true intent and purpose were concealed by [their] actions or conduct,' " ' " which the jury could reasonably conclude was " ' " 'part of [their] plan to take the victim[s] by surprise.' " ' " (*Duong, supra*, 10 Cal.5th at p. 67.) Accordingly the concealment of purpose finding is supported by substantial evidence.

2.    *Watching and Waiting*

We next examine whether sufficient evidence supports a finding of "a substantial period of watching and waiting for an opportune time to act." (*Flinner, supra*, 10 Cal.5th 686, 748.)

"[T]he purpose of the watching and waiting element ' " 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.' " ' " (*Flinner, supra*, 10 Cal.5th at p. 749.)  " '[T]he lying-

12

in-wait special circumstance requires no fixed, quantitative minimum time, but the lying in wait must continue for long enough to premeditate and deliberate, conceal one's purpose, and wait and watch for an opportune moment to attack.'" (*People v. Clark* (2016) 63 Cal.4th 522, 629.) To distinguish the circumstance from ordinary premeditation and deliberation, a "distinct period of watchful waiting" is required. (*Nelson, supra*, 1 Cal.5th at p. 551.) "'Watchful' does not require actual watching; it can include being 'alert and vigilant' in anticipation of the victim's arrival to take him or her by surprise." (*People v. Streeter* (2012) 54 Cal.4th 205, 247.)

According to Harmon, "there is no evidence" that he and Delarosa "watched and waited for any period of time to find an opportune moment to strike," and that accordingly, the evidence does not prove any such activity for a period of "substantial duration." As we will explain, we agree.

The surveillance camera footage establishes that 26 minutes elapsed between when Harmon and Delarosa (1) saw A.V.'s car in the parking lot as they drove through in their friend's car, and (2) walked into the parking lot and committed the shooting. At trial, there was conflicting evidence about what Harmon and Delarosa may have been doing during those 26 minutes.

Delarosa testified that he and Harmon spent 26 minutes with their friend, at the school, smoking marijuana in the friend's car, after which they walked directly to the park. If the jury credited that testimony, Harmon and Delarosa would not have been waiting and watching during the 26 minutes because they would have been at the school, away from the park, and doing something else.

In contrast, the friend who drove Harmon and Delarosa through the parking lot provided a different account of the 26 minutes. According to the friend's testimony, he dropped off Harmon and Delarosa a short distance

13

away, near the school, *immediately after* exiting the parking lot, at the *beginning* of the 26 minutes. He then saw Harmon and Delarosa walk back toward the parking lot. The friend drove home, and "minutes" later, at his house, he heard a sound like fireworks or gunshots coming from the scene of the shooting.[5] If the jury credited the friend's testimony, there is a gap in the evidence about what occurred in the 26 minutes after Harmon and Delarosa were dropped off near the school.

Although one could speculate that Harmon and Delarosa spent some or all of the 26 minutes surreptitiously watching A.V. and J.R. to determine the right time to launch an attack, that conclusion would be based on nothing more than conjecture. " '[A] reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Ware* (2022) 14 Cal.5th 151, 167.) Indeed, nothing about the nature of the attack suggested that Harmon and Delarosa watched and waited until A.V. and J.R. were in a more vulnerable position. On the contrary, A.V. and J.R. stayed put, inside the parked car, during the *entire* 26 minutes and were *still* in the same position when Harmon and Delarosa walked into the parking lot and shot at them. In the absence of any basis to infer that Harmon and Delarosa spent some or all of the 26 minutes observing their victims and waiting for the right time to attack, it is just as likely that they spent the time doing something else. For

---

[5] Contrary to his trial testimony, when the friend was interviewed by law enforcement, he described events similar to those described by Delarosa. Specifically, the friend told law enforcement that he, Harmon and Delarosa "bought the marijuana at the dispensary in Perris, smoked marijuana at the park near the dispensary in Perris, and then drove back to the elementary school next to [the park where the shooting occurred] and smoked marijuana again."

14

example, even if Harmon and Delarosa did not spend the time smoking marijuana at the school as Delarosa testified, they could just as plausibly have spent the time away from the park discussing whether to engage in a shooting, or going somewhere to procure the firearm or masks they used during the shooting. Although those activities may support a finding of premeditation, they do not constitute watching and waiting for an opportune time to act. (See *Nelson, supra*, 1 Cal.5th at p. 552 ["the fact that there was substantial evidence of premeditation and deliberation does not necessarily mean there was substantial evidence of watching and waiting for an opportune time to act."].)

The instant case is similar to *Nelson, supra*, 1 Cal.5th 513, in which our Supreme Court determined that, in the absence of evidence regarding the defendant's movements before he approached the victims and shot them, the evidence was insufficient to support a finding of watching and waiting. In *Nelson*, the defendant "rode his bicycle to the area near the . . . parking lot, where he had reason to believe the victims would be waiting to go to work. He concealed his bicycle and came up behind his victims on foot to take them by surprise," after which he then shot them. (*Id*. at p. 551.) Our Supreme Court explained that there was "no factual basis for an inference that before approaching the victims, [the defendant] had concealed his bicycle and waited for a time when they would be vulnerable to surprise attack. The jury was presented with no evidence from which it could have chosen, beyond a reasonable doubt, that scenario over one in which defendant arrived after the victims, dismounted from his bicycle, and attacked them from behind without any distinct period of watchful waiting." (*Ibid*.) The same analysis applies here. Because it is not known what occurred during the 26 minutes before the shooting, the jury was presented with no evidence from which it could

15

have chosen, beyond a reasonable doubt, a scenario in which Harmon and Delarosa waited and watched for an opportune time to attack before walking into the park and shooting their victims.  Without more, the fact that Harmon and Delarosa drove through the park and confirmed the presence of their victims 26 minutes before the attack, does not support a reasonable inference that Harmon and Delarosa spent any of the next 26 minutes in the activity of watchful waiting.

Accordingly, we conclude that one of the elements of lying in wait, namely, "a substantial period of watching and waiting for an opportune time to act" (*Flinner, supra*, 10 Cal.5th at p. 748), is not supported by substantial evidence.  The true findings on the lying-in-wait special circumstance must therefore be reversed, and lying in wait cannot serve as the basis for the first degree murder convictions in count 1.

B.    *Due to the Theory of Premeditation and Deliberation, the First Degree Murder Convictions May Be Affirmed Despite the Lack of Substantial Evidence to Support Lying in Wait*

Having concluded that insufficient evidence supports a finding of lying in wait, we next consider whether that conclusion requires the reversal of the first degree murder convictions in count 1.  As we have explained, the jury was instructed that it could return a verdict of first degree murder based on two alternative theories:  (1) the murder was committed with premeditation and deliberation; or (2) the murder was committed by lying in wait.

"A first degree murder verdict will be upheld if there is sufficient evidence as to at least one of the theories on which the jury is instructed, 'absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.' " (*Nelson, supra*, 1 Cal.5th at p. 552 [affirming first degree murder  based on sufficient evidence of premeditation and deliberation despite insufficient evidence to support lying in wait].)

16

"[T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty *solely* on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 (*Guiton*), italics added.)  In making that determination, we examine "the entire record . . . , including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict."  (*Ibid.*)

Here, neither Harmon nor Delarosa challenge the sufficiency of the evidence to support a finding of premeditation and deliberation.  Thus, our inquiry is whether there is a reasonable probability that the jury returned a verdict of first degree murder based "*solely*" on lying in wait, rather than *also* on premeditation and deliberation.  (*Guiton, supra*, 4 Cal.4th at p. 1130, italics added.)  The jury's express findings in connection with the attempted murder in count 2 preclude any reasonable probability the jury relied solely on lying in wait as the theory for first degree murder.

Specifically, the jury returned verdicts in count 2 which expressly stated they found "the attempted murder WAS premeditated and deliberate." Based on the undisputed evidence at trial, the murder of J.R. and the attempted murder of A.V. were both caused by Harmon's act of indiscriminately shooting a series of bullets, from a distance, into the car where the two victims sat together in close proximity.  The evidence supports no other conclusion than that it was only a matter of chance that one of the bullets fatally injured J.R. by hitting him in the head and another of the bullets nonfatally injured A.V. by hitting him in the right arm.  Accordingly, if the jury found that the act of shooting A.V. in the right arm amounted to attempted murder because it was committed with premeditation and deliberation, they also would have specifically found, if asked, that the

17

murder of J.R. by shooting him in the head inside the same car, at the same time, was also premeditated and deliberate.

We therefore affirm the first degree murder conviction despite our conclusion that the theory of lying in wait was not supported by substantial evidence.[6]

C.  *Appellants' Contention That the Trial Court Erred in Refusing to Instruct on Imperfect Self-Defense as a Basis for Voluntary Manslaughter Verdicts in Both Counts*

Harmon and Delarosa next contend that the trial court prejudicially erred in refusing to instruct the jury that it could reach a verdict of voluntary manslaughter in count 1 and attempted voluntary manslaughter in count 2 if it found that the defendants acted in imperfect self-defense.

1.  *The Trial Court Erred in Not Instructing on Imperfect Self-Defense*

"Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury." (*People v. Duff* (2014) 58 Cal.4th 527, 561.)  "Under the doctrine of imperfect self-defense . . . '[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . , not murder.'" (*Schuller, supra*, 15 Cal.5th at p. 243; see also *People v. Rios* (2000) 23 Cal.4th 450, 461 [the mitigating circumstance of imperfect self-

_____

6    As to the first degree murder convictions in count 1, Harmon and Delarosa additionally argue that those convictions should be reversed due to an instructional error that inadvertently omitted part of the instruction on lying in wait as a theory of first degree murder.  Because we are affirming the convictions in count 1 based on premeditation and deliberation rather than based on lying in wait, we need not, and do not, address that instructional error.

defense serves to "reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide.' "].)  "[I]mperfect self-defense, 'obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' " (*Schuller*, at p. 252.)  "[U]nreasonable self-defense "is based on a defendant's assertion that he lacked malice . . . because he acted under an unreasonable *mistake of fact*—that is, the need to defend himself against imminent peril of death or great bodily harm." (*People v. Elmore* (2014) 59 Cal.4th 121, 136.)

"Imperfect self-defense differs from complete self-defense, which requires not only an *honest* but also a *reasonable* belief of the need to defend oneself." (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*), italics added.) "To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief [in the need to defend with deadly force] must . . . be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

CALCRIM No. 571 describes the requirements for imperfect self-defense as follows:  "The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if: [¶] 1. The defendant actually believed that (he/she/ [or] someone else/ *<insert name of third party>*) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT 3. At least one of those beliefs was unreasonable." (CALCRIM No. 571.)

Here, the trial court instructed the jury on *complete* self-defense, but both Harmon and Delarosa requested that the trial court also instruct the jury on the lesser included offense of voluntary manslaughter based on

19

*imperfect* self-defense.[7]  The trial court refused to instruct on imperfect self-

defense, explaining that the evidence supported *only* an instruction for

complete self-defense.  As the trial court explained, "what I looked at is you

only have one act here as to the basis for a voluntary manslaughter theory,

and that is that [J.R.] popped up with a gun and fired the gun.  I did not

believe that there was any evidence that would support this because it's

based on the facts and the evidence that we have in this case.  Mr. Harmon, if

the jury believes Mr. Delarosa's recitation of the facts, would be acting

reasonabl[y] in his defense of others and defense of himself.  There [were] no

other acts or anything else the jury could consider.  So I did not believe that

imperfect self-defense was an appropriate instruction to give."

The trial court was required to instruct on imperfect self-defense "if

there [was] substantial evidence to support the theory." (*Schuller, supra*,

15 Cal.5th at p. 253.)  "Substantial evidence is evidence from which a jury

could conclude beyond a reasonable doubt that the lesser offense [of voluntary

manslaughter] was committed," but does not include evidence that is

"[s]peculative, minimal, or insubstantial." (*Simon, supra*, 1 Cal.5th at

p. 132.)  "We review de novo a trial court's decision not to give an imperfect

self-defense instruction." (*Id.* at p. 133.)

Harmon, in an argument joined by Delarosa, argues that the trial court

erred in refusing to instruct on imperfect self-defense because there are two

scenarios under which the jury could have found that Harmon shot at J.R.

and A.V. in an actual but unreasonable belief that he needed to do so to

---

7  The discussion in the trial court did not focus on the attempted murder
count.  However, if an imperfect self-defense instruction was warranted for
the murder count, it would also be warranted for the attempted murder
count, just as the trial court instructed on *complete* self-defense as to both
counts.

defend himself.  In the first scenario, the jury could have found that Harmon saw J.R. pull out a gun but mistakenly believed that J.R. *fired* the gun, in which case Harmon's belief in the need to defend himself would have been unreasonable and based on a mistake of fact.  In the second scenario, the jury could have found that J.R. *did* fire a gun (as Delarosa testified), but that because J.R. fired only a single shot, after which A.V. immediately started to drive away, it was unreasonable for Harmon to believe that, to defend himself, he was required to run toward A.V.'s moving car and continue to fire shots at it as shown in the surveillance video.

We are persuaded that a reasonable jury could interpret the facts to support the second scenario described by Harmon.[8]  The evidentiary support for that scenario was highlighted in a portion of the prosecutor's *own* closing argument to the jury on the issue of complete self-defense, as follows:

> "The other thing that you learn about self-defense is that you cannot use any more force than is reasonably necessary.  So say we believe Isaac Delarosa, and [J.R.] fired off one shot.  Let's remember what his positioning was.  So he described how he was sitting in the passenger seat of the car, and remember [Harmon's] coming up from behind him. . . .  [J.R.] has the gun here, and [Delarosa] said [J.R.] turned like this and fired.  [¶] This was his exact position.  It's not going back to where [J.R. and Harmon are] at.  It's going over this way.

> "So what is this imminent [danger]?  According to Mr. Delarosa, there's only that one shot [by J.R.].  So Mr. Harmon fires off two.  The car starts to move away.  At this point, the car is leaving.  The threat is over.  No more shots are being fired.  Mr. Harmon follows that car and fires at least three more.

---

8    Because we rely on the second scenario to conclude that the evidence supports an imperfect self-defense instruction, we need not, and do not, consider whether the evidence also would support a finding of imperfect self-defense based on the first scenario posited by Harmon, i.e., that J.R. pulled out a gun but did not shoot it.  Relevant to that issue, however, is Delarosa's testimony that he actually saw a flash coming from the muzzle of J.R.'s gun.

21

"So is this more force than would be reasonably necessary? If you believe that he acted in self-defense, it's a complete acquittal. He's not culpable at all for the murder. So that would be the end of it. That would be the end of your analysis, because self-defense is considered to be a perfect defense, and that is why the requirements are so incredibly strict.

"And you notice it all relies on reasonable. And it's what would a reasonable person do in this same situation? Would a reasonable person do the same thing Mr. Harmon did? If that's true, then he gets self-defense. But you have to use not what Mr. Harmon thinks is reasonable, [but] what you all think is reasonable."

As we have explained, the requirements of imperfect self-defense would be satisfied if Harmon actually believed he was in imminent danger of being killed or suffering great bodily injury and that deadly force was necessary to defend against that danger, but at least one of those beliefs was unreasonable. (CALCRIM No. 571.) That is exactly the scenario described by the prosecutor's closing argument. If, as Delarosa testified, J.R. fired a gun at Harmon, and Harmon reacted by immediately returning fire in self-defense, it might be reasonable to take the *first* shots, but after A.V. started to drive away and J.R. did not fire any more shots, a jury could find that Harmon overreacted, in an unreasonable manner, by running toward A.V.'s car and continuing to shoot at it. As the prosecutor argued, at that point, a reasonable person in Harmon's position might have concluded that the danger had subsided and that the continued use of deadly force was unnecessary.

In their respondent's brief, the People acknowledge the scenario described in the prosecutor's closing argument, but they attempt to distance themselves from it. Contrary to what the prosecutor argued to the jury, the People contend that if J.R. did shoot at Harmon first as Delarosa testified, no rational jury could have found that Harmon acted unreasonably in shooting

four or five shots at J.R. in response. Specifically, stressing that the entire shooting occurred over the course of no more than a few seconds, the People contend that "the shots were all fired in a quick burst," and "if Harmon had indeed been ambushed and shot at, it would *not* have been unreasonable for him to return fire for the next two seconds." (Italics added.)

The argument is belied by the actual facts of the shooting. The surveillance video shows that A.V.'s car started to drive away shortly after the incident began. As described in Delarosa's testimony, J.R. fired only *one* shot, which was *before* A.V. started to drive in a direction *away* from Harmon. In response, *after* shooting two or three shots at the car, Harmon ran towards the car and *continued* to shoot. Although the incident was brief, there was time enough for Harmon to run forward, reposition himself, take aim, and fire two more shots. Therefore, the People are not correct in representing that "the shots were all fired in a quick burst." A rational jury could find that it was unreasonable for Harmon to run toward the fleeing car, take aim again, and continue to use deadly force after J.R. ceased shooting and A.V. started to drive away.

Therefore, based on the second scenario posited in Harmon's briefing, we conclude that the evidence was sufficient to support an instruction on imperfect self-defense. The trial court erred in refusing Harmon's and Delarosa's request for such an instruction.

2.    *The Error Was Not Prejudicial*

Having concluded that the trial court erred, we must determine whether the error was prejudicial. "[W]hen the record contains substantial evidence of imperfect self-defense, the trial court's failure to instruct on that theory amounts to constitutional error and is thus subject to review under the federal *Chapman* standard." (*Schuller, supra*, 15 Cal.5th at p. 243, citing

23

*Chapman v. California* (1967) 386 U.S. 18, 24.) Constitutional error is implicated because "a trial court's failure to instruct on imperfect self-defense amounts to an incomplete instruction on the malice element of murder." (*Schuller*, at p. 254.) Under the *Chapman* standard, reversal is required "unless it appears ' "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*Schuller*, at p. 261.)

Our Supreme Court has stated that where, as here, the instructional error involves the omission of an imperfect self-defense instruction, " 'the [harmless error] test is exacting.' " (*Schuller, supra*, 15 Cal.5th at p. 261.) Specifically, the error is harmless only if "no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error]." (*Id.* at p. 244.) As we will explain, the jury's findings on certain elements of the lying-in-wait special circumstance establish, beyond a reasonable doubt, that the jury would not have found imperfect self-defense if it had been instructed on that theory.

As the jury was instructed pursuant to CALCRIM No. 728, to make a true finding on the lying-in-wait special circumstance, it was required to find the following, in addition to an intent to kill:

"1. [The defendant] concealed his or her purpose from the person killed;

"2. [The defendant] waited and watched for an opportunity to act;

"3. Then [the defendant] made a surprise attack on the person killed from a position of advantage;

"AND

"4. [The defendant] intended to kill the person by taking the person by surprise.

24

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation."

Although, as we have discussed above, insufficient evidence supports a finding on the second element of lying in wait, namely that Harmon and Delarosa "waited and watched for an opportunity to act," Harmon and Delarosa have not established any failure of proof for the *remaining* elements of lying in wait. Therefore, we look to the jury's findings on those remaining elements in conducting our harmless error analysis. (See *Schuller, supra,* 15 Cal.5th at p. 244 [describing a harmless error analysis based on "the findings reflected in the verdict"].)

To conclude that a defendant acted in imperfect self-defense, a jury is required to find as follows: "1. The defendant actually believed that (he/she/ [or] someone else/ *<insert name of third party>*) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT 3. At least one of those beliefs was unreasonable." (CALCRIM No. 571.) Under the theory of imperfect self-defense described by Harmon and Delarosa, Harmon approached A.V.'s car without an intention to shoot at it, but his intent changed when he saw J.R. point or shoot a gun at him. Under that scenario, when J.R. drew or shot his gun, Harmon could have perceived imminent danger, which Harmon believed he needed to defend against by using deadly force.

However, in finding the elements of lying in wait satisfied, the jury rejected the scenario advanced by Harmon in support of the instruction on imperfect self-defense. As shown by their true finding on the lying-in-wait special circumstance, the jury necessarily found that Harmon and Delarosa intentionally killed J.R. by "ma[king] a surprise attack on [J.R.] from a

25

position of advantage" while "taking [J.R.] by surprise" and "conceal[ing] [their] purpose from [J.R.]." (CALCRIM No. 728.) Having made those findings, the jury could not have found an imperfect self-defense scenario in which Harmon and Delarosa used deadly force against J.R. because they unreasonably believed that doing so was necessary to defend themselves against imminent danger when they saw J.R. use his gun.[9]

Consistent with our analysis, in *People v. Cruz* (2008) 44 Cal.4th 636 our Supreme Court held that a jury's true finding on a lying-in-wait special circumstance "negate[d] any possibility that defendant was prejudiced from the failure to instruct on . . . unreasonable self-defense theories of manslaughter." (*Id.* at p. 665.) As Harmon points out, the facts of *Cruz* differ from this case, as the jury there additionally found true a *second* special circumstance of murder for the purpose of perfecting or attempting to perfect escape from lawful custody (*Cruz*, at p. 643, citing § 190.2, subd. (a)(5)), and our Supreme Court referred *collectively* to the two special circumstance findings when stating that "[t]hese special circumstance findings themselves negate any possibility that defendant was prejudiced." (*Cruz*, at p. 665.) Nevertheless, we regard *Cruz* as precedent that is, at the least, *consistent* with our conclusion that the jury's findings on the elements of the lying-in-

---

9    Although we have noted the jury's finding that Harmon and Delarosa intended to kill, the intent-to-kill finding, standing alone, is not necessarily inconsistent with imperfect self-defense. " 'A finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' . . . when a person kills ' " ' . . . in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense.' " ' " (*Schuller, supra*, 15 Cal.5th at p. 252, citations omitted.) However, when *combined* with the other elements of the lying-in-wait special circumstance found by the jury and supported by substantial evidence, the finding of intent contributes to our conclusion that the jury's verdict establishes it would not have found imperfect self-defense had it been properly instructed.

26

wait special circumstance render harmless the trial court's error in failing to instruct on imperfect self-defense.[10]

Further, although the lying-in-wait special circumstance applied only to the murder of J.R. in count 1, whereas the instruction on imperfect self-defense should have been given as to both the murder count (count 1) and the attempted murder count (count 2), we nevertheless rely on the jury's findings for the lying-in-wait special circumstance finding to conclude that the failure to instruct on imperfect self-defense was harmless as to both count 1 and count 2. The shooting here consisted of a series of gunshots into a vehicle where both J.R. and A.V. were sitting. Because of the physical proximity of the two victims, who sat next to each other in the car that Harmon shot into, there is no factual basis for a jury to have concluded that Harmon and Delarosa planned to murder by lying in wait *only* as to J.R., but *not* as to A.V. Therefore, we conclude beyond a reasonable doubt that the jury's true finding on the elements of lying in wait with respect to J.R.'s murder inescapably leads to the conclusion that the jury would have rejected imperfect self-defense *both* as to the murder of J.R. and the attempted murder of A.V., had it been instructed on that theory.

---

[10]     In his concurrence in *Schuller*, Justice Liu expressed the view that a finding of first degree murder based on premeditation and deliberation is *not* inconsistent with a finding of imperfect self-defense. (*Schuller, supra*, 15 Cal.5th at p. 265 (conc. opn. of Liu, J.).) Although we need not, and do not, take a position on that issue, we note that a finding of lying in wait includes elements *beyond* premeditation and deliberation, even though there is some overlap. (*People v. Sandoval* (2015) 62 Cal.4th 394, 416 [" 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from "ordinary" premeditated murder to justify treating it as a special circumstance' "].)

27

In sum, based on the jury's findings on the elements of the lying-in-wait special circumstance that were supported by substantial evidence, we conclude that the trial court's error in failing to instruct on voluntary manslaughter based on imperfect self-defense was harmless beyond a reasonable doubt for both count 1 and count 2.

D. *The Trial Court Did Not Err in Admitting Evidence That Delarosa Possessed a Gun Three Weeks Prior to the Shooting*

Finally, we consider Delarosa's contention that the trial court erred in allowing the People to present evidence that, three weeks before the shooting, he possessed a gun.

On January 19, 2020, Delarosa sent a message to his girlfriend using Facebook. The message stated, "I heard random ass people fighting [right now], babe[,] and I thought they were outside of my house[.] I went outside with my gun [and] everything." Counsel for Delarosa filed an in limine motion arguing that the message should be excluded, either because it was irrelevant or because it was unduly prejudicial under Evidence Code section 352. During an in limine hearing, counsel additionally argued that the Facebook message constituted improper character evidence. In opposition, the prosecutor argued that because the crimes were committed with a gun, it was relevant that Delarosa possessed a gun prior to the shooting, even if he was not the shooter. More specifically, the prosecutor explained that Delarosa's possession of a gun was relevant because "Mr. Harmon, if he takes the stand, will tell the jury he got the gun from Mr. Delarosa. I have to prove that he is an aider and abettor to the crime. So if I can prove that he had a gun on January 19th, 2020, then a gun is used to kill the person that he actually has the beef with, or to shoot at the person he has the beef with, I think that's highly probative."

28

The trial court ruled that it would allow the People to introduce the Facebook message into evidence. The trial court explained that evidence of Delarosa's gun possession was relevant to the issues presented at trial, and the Facebook message was not unduly prejudicial under Evidence Code section 352.

During trial, the People introduced evidence of the Facebook message through the testimony of a law enforcement investigator. When Delarosa testified, he stated that when he sent the Facebook message to his girlfriend, he was lying about having a gun because he was "trying to act like a tough guy." Harmon elected not to testify, and no evidence was presented that Delarosa gave Harmon the gun used in the shooting.

" 'We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26.) "If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.) "[W]e review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Camacho* (2022) 14 Cal.5th 77, 123.)

Delarosa contends that the Facebook message should have been excluded from evidence as "irrelevant because no evidence ties the murder gun to any weapon possessed by Delarosa at any time." Specifically, he points out that no evidence was presented about the type of gun used in the

29

shooting, and it was unknown what type of gun Delarosa was referencing in the Facebook message. Therefore, according to Delarosa, the Facebook message "in no way supports an inference of supplying a weapon to Harmon on the day of the shooting."

### 1. *The Facebook Message Was Relevant Evidence*

We are not persuaded that the Facebook message was irrelevant to any issue in the trial. Evidence Code section 210 defines relevant evidence as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*) "The trial court has broad discretion . . . in determining the relevance of evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 900.) As the prosecutor explained at the in limine hearing, evidence of Delarosa's gun possession was relevant because Harmon would testify that the gun used during the shooting came from Delarosa. Although Harmon ultimately decided against testifying, "[i]n determining whether the trial court abused its discretion" in admitting evidence "we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during the trial." (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208 (*Fruits*).) Based on the prosecutor's offer of proof that Harmon, if he testified, would say Delarosa gave him the gun, evidence that Delarosa possessed a gun three weeks before the shooting was relevant because it would help the jury assess the credibility of Harmon's statement that Delarosa gave him the gun. (See *People v. Abel* (2012) 53 Cal.4th 891, 928 (*Abel*) [evidence that the defendant possessed weapons was admissible when introduced "to corroborate [a witness's] testimony of having seen similar weapons in defendant's possession during the same general time period]; Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to

30

the credibility of a witness . . . ."].)  In turn, establishing that Delarosa was the source of the gun would be relevant to whether Delarosa acted as an aider and abettor.

Delarosa argues that because there was no information about the type of gun used in the shooting or the type of gun referenced in the Facebook message, the only purpose of admitting evidence of the Facebook message would be to support "speculative inferences of propensity."  The argument lacks merit.  The general rule is that "[e]vidence a defendant possessed weapons that were *not* used to commit a crime is inadmissible to show the defendant committed the crime."  (*Abel,* supra, 53 Cal.4th at p. 928, italics added.)  This is because " 'such evidence tends to show, not that [the defendant] committed the crime, but only that he is the sort of person who carries deadly weapons.' "  (*People v. Smith* (2003) 30 Cal.4th 581, 613.)  However, "[w]hen the specific type of weapon used to commit a homicide is *not* known, it may be permissible to admit into evidence weapons found in the defendant's possession . . . that *could have been* the weapons employed.  There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon."  (*People v. Riser* (1956) 47 Cal.2d 566, 577, italics added.)  Here, the gun Delarosa mentioned in the Facebook message *could have been* the gun used in the shooting.  The evidence of Delarosa's gun possession was therefore relevant to an issue other than Delarosa's character, namely, to corroborate Harmon's expected testimony that Delarosa gave him a gun.

Because Delarosa's gun could have been the weapon that Harmon used in the shooting, one of the central cases upon which Delarosa relies, *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, does not support his argument, and, in fact, undermines it.  In *McKinney* the defendant was

31

accused of using a knife (of an undetermined type) to commit a murder. (*Id.* at p. 1381.) *McKinney* held that some of the evidence regarding the defendant's past knife possession was irrelevant and inadmissible as improper character evidence, including evidence that the defendant previously possessed a particular knife that he undisputedly no longer had access to at the time of the murder. (*Id.* at pp. 1382–1383.) However, there was one specific knife that, according to some of the testimony, the defendant *still* possessed within seven weeks of the murder. (*Id.* at p. 1383.) *McKinney* explained that because the jury could infer the defendant still had possession of that knife at the time of the murder, the evidence regarding that knife was relevant on an issue other than the defendant's character because it made the defendant's "identity as the murderer[ ] more probable." (*Id.* at p. 1384.) Here, similar to *McKinney*, the jury could infer that Delarosa still had possession of the gun that he referenced in the Facebook message only three weeks before. Further, as was the case with the knife in *McKinney*, it was possible that Delarosa's gun was the same type of gun used in the shooting. Therefore, based on the logic of *McKinney*, evidence of Delarosa's gun possession three weeks before the shooting was admissible because it tended to prove that Delarosa acted as an aider and abettor by giving Harmon the gun.

2. *The Trial Court Did Not Err In Concluding That the Facebook Message Was Not Unduly Prejudicial*

Delarosa next argues that, based on Evidence Code section 352, the trial court abused its discretion by admitting the Facebook message into evidence.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time

or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) " ' "Prejudice," as used in Evidence Code section 352, is not synonymous with 'damaging.' [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587.) The prejudice that section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.)

Delarosa contends that the Facebook message was prejudicial because it suggested he "had a rather glib attitude toward gun violence." Specifically, Delarosa points out that the message was "followed by 'certain emojis,' " which could be interpreted as "suggesting he believed the conduct was funny or cute." The law enforcement investigator who testified described the emojis as "a smiley face emoji and a devil horn emoji." More specifically, the printed Facebook message that was admitted into evidence shows a face-with-tears-of-joy emoji and a smiling-face-with-horns emoji at the end of the message.

Delarosa's reliance on the presence of the emojis is unavailing because, as the record shows, the trial court was not aware of the emojis when it considered whether the Facebook message should be excluded from evidence. Attached to Delarosa's motion in limine, as Exhibit B, was a printed version of the Facebook message. However, due to the format of that message as it appears in Exhibit B, the emojis were not shown. Instead, on Exhibit B, instead of being followed by two emojis, the message is followed by four

closely-spaced rectangles.  Neither the text of Delarosa's in limine motion, nor anything said during the in limine hearing would have informed the trial court that the four rectangles represented two emojis.

When deciding whether a trial court abuses its discretion in making an evidentiary ruling under Evidence Code section 352, we look to the information available to the trial court at the time it ruled.  (*Fruits, supra*, 247 Cal.App.4th at p. 208.)  Here, based on what the trial court knew at the time it ruled, because it was unaware of the emojis, the trial court had no reason to conclude that the message suggested a "glib attitude toward gun violence."

Apart from the emojis, Delarosa does not identify any other potentially inflammatory items in the Facebook message, and we do not perceive any. Although Delarosa mentions a gun in the message, he does not state that he plans to use the gun to perpetrate violence or commit a crime.  He appears to be indicating that he is taking his gun with him for protection as he goes outside to investigate a fight.  We therefore find no merit to Delarosa's contention that, due to its prejudicial nature, the trial court should have excluded the Facebook message from evidence pursuant to Evidence Code section 352.

DISPOSITION

In count 1, as to both Harmon and Delarosa, we reverse the true findings on the lying-in-wait special circumstance. In all other respects, we affirm the judgment and remand for resentencing.


IRION, Acting P. J.

WE CONCUR:


DATO, J.


RUBIN, J.